NUMBER 13-05-389-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG







LUCY VILLAGOMEZ, INDIVIDUALLY, AND AS 

REPRESENTATIVE OF THE ESTATE OF ISMAEL 

VILLAGOMEZ, DECEASED, AND FRANCISCO 

VILLAGOMEZ AND MARIA VILLAGOMEZ
, Appellants,


v.



ROCKWOOD SPECIALTIES, INC., Appellee.





On appeal from the 25th District Court


of Gonzales County, Texas.






DISSENTING OPINION



Before Chief Justice Valdez and Justices Castillo and Garza


Dissenting Opinion by Justice Castillo



 Because I would affirm the trial court's order sustaining the special appearance
of appellee, Rockwood Specialties, Inc. ("Rockwood"), I respectfully dissent. 

I. Background

 The underlying suit was brought following an incident that occurred on February
11, 2003, at Southern Clay Products, Inc. ("Southern Clay"), located in Gonzales,
Texas. Ismael Villagomez, an employee of Southern Clay, was performing work inside
an empty mixing tank when a large quantity of steam was released into the tank,
severely burning him and resulting in his death. Suit was brought on March 13, 2003,
by appellants, Lucy Villagomez, Individually, and as Representative of the Estate of
Ismael Villagomez, Deceased, and Francisco and Maria Villagomez (collectively
"Villagomez"). Claims were brought under the Texas wrongful death statute and under
the survival act. 

 Southern Clay, a Texas corporation in business since the early 1950s, is a
subscriber under the Texas Workers' Compensation Act. Southern Clay was an
independent company until 1991, when it was purchased by Laporte, Inc. In 2000,
Laporte, Inc., was acquired by Rockwood. Southern Clay is now a wholly owned
subsidiary of Rockwood, a Delaware corporation with headquarters in New Jersey. 

 Villagomez alleges that Rockwood is independently negligent for affirmative acts
and omissions, and that it voluntarily undertook to perform services "it knew or should
have known were necessary for the protection of Ismael Villagomez and failed to
exercise reasonable care in performing those services." Villagomez alleges that
Southern Clay relied on Rockwood for the performance of those services, and that
performance increased the risk of harm to Ismael Villagomez. 

 

 Rockwood filed a special appearance, urging that it has no connections or
interactions with the State of Texas sufficient to bring it within the jurisdiction of a
Texas court. The parties undertook considerable discovery on this jurisdictional
question, including six depositions at which numerous documents were tendered as
exhibits. Extensive evidence and briefing was submitted to the trial court. 

 A hearing on the special appearance was held March 28, 2005. (1) On May 5,
2005, the trial court forwarded a letter to counsel stating:

I have reviewed completely the deposition excerpts, affidavits (and
objections thereto) and all of the evidence admitted before the court, as
well as the briefs of the parties and conducted my own research. Thanks
to all counsel for a well-presented and well-argued motion.


It is the opinion of the Court that the Court does not have either general
or special jurisdiction over Rockwood Specialties, Inc. and that the
Special Appearance of Rockwood Specialities, Inc. should be
SUSTAINED.


The court requested that an order to that effect be submitted. In a formal order dated
May 24, 2005, the trial court sustained Rockwood's special appearance, finding it had
neither specific nor general jurisdiction over Rockwood. (2) Extensive findings of fact and
conclusions of law were issued by the trial court on June 17, 2005. This interlocutory
appeal ensued.

II. Jurisdictional Facts in Issue

 In its special appearance and its later supporting briefs, Rockwood tendered
evidence to show that it is only a holding company with no operations of its own. It
owns the stock of thirteen separately maintained subsidiary companies, one of which
is Southern Clay. Rockwood briefed and tendered evidence to support its position that
(1) it has never done business in Texas, (2) has no offices or agents and is not
registered to do business in Texas, (3) owns no real or personal property in Texas, (4)
maintains no bank or other financial accounts in Texas, (5) has no employees in Texas,
(6) does not target business in Texas, either by mail or through its website, and (7)
only makes visits to its Texas subsidiary to ensure operations are within budget and
to determine if other material issues exist of which it, as sole shareholder, needs to be
aware. Rockwood tendered extensive evidence to show it never undertook to ensure
the safety of Southern Clay employees and that its only contacts with Southern Clay
were those normal interactions between a parent and its subsidiary. Rockwood also
urged that traditional notions of fair play and substantial justice would be offended by
asserting jurisdiction over it. 

 Evidence tendered by Rockwood included the following: (1) deposition testimony
and the affidavit of Thomas Riordan, Vice President in Law and Administration for
Rockwood; (2) deposition testimony and the affidavit of Michael Piacentino, the
Director of Environmental, Safety and Risk Management for Rockwood; (3) deposition
testimony of Donna Abrunzo, a paralegal and Director of Administration for Rockwood;
(4) deposition testimony and the affidavit of Vernon Sumner, President of Southern
Clay; (5) deposition testimony of Richard Holmes, Manager of Safety Health and
Environmental Systems at Southern Clay; (6) the employee agreement between Ismael
Villagomez and Southern Clay; and (7) deposition testimony and the affidavit of Keith
Stultz, the Operations Manager at Southern Clay. 

 Villagomez contends that the evidence establishes that (a) Sumner, president
of Southern Clay, is in reality an employee of Rockwood, living and performing
services in Texas; (b) Rockwood issued a mandatory Safety, Health and Environmental
("SHE") Manual that prescribes safety policy for its subsidiaries; and (c) Rockwood has
conducted numerous inspections and performed safety training at Southern Clay in
Texas. Villagomez further urges that Rockwood owns property in Texas (i.e., the
business records of Southern Clay), and that Rockwood has entered into other
contracts with entities in Texas, thereby subjecting itself to the jurisdiction of Texas
courts. 

 Villagomez submitted documentary evidence, including the following: (3) (1)
information from Rockwood's website; (2) Rockwood's "SHE Management Program
Guidance Manual," as well as excerpts from that manual including a sample guide for
investigating a major incident; (3) summary of annual SHE performance at Southern
Clay, dated September 2002; (4) a clay additives SHE Divisions summary report dated
January 2001; (5) Rockwood SHE reports for January and May 2001, authored by
Mike Piacentino; (6) an itemized listing and copies of itineraries for visits made by
Rockwood personnel to Texas between November 2000 and March 2005, including
the purposes therefor; (7) the Mine Safety and Health Administration ("MSHA") report
and investigation materials for a May 2001 accident at Southern Clay; (8) the MSHA
report and investigation materials for the February 2003 accident at Southern Clay that
involved Villagomez; (9) copies of Southern Clay's internal investigative reports from
the 2001 and 2003 incidents; (10) Southern Clay's letter to MSHA objecting to the
MSHA report of the January 22, 2003 incident; (11) Southern Clay hazard and near-miss reports; (12) various e-mail communications between Southern Clay and
Rockwood personnel; (13) various reports submitted by Southern Clay to Rockwood's
risk management department; (14) sample copies of Southern Clay self-audits; (15)
documents providing authority from Rockwood to Southern Clay to borrow monies and
associated loan documents (reflecting loan from Rockwood to Southern Clay); (16)
property conservation report, prepared on behalf of Rockwood's risk management
department, relating to Southern Clay's work site; (17) Rockwood's administrative
services agreement with a Texas corporation, HealthFirst (a third party administrator
for benefits); (18) Rockwood's records management policy; (19) the employment
contract with Southern Clay's president, Vernon Sumner and Rockwood's
announcement of his appointment as president; (21) a listing of emergency contact
numbers posted at Southern Clay which includes the contact number for Rockwood's
Mike Piacentino; (22) Southern Clay's safety policy and its confined space entry
procedure; (23) loss control reports prepared by a third party for Southern Clay,
relating to boiler examination in December 2001; and (24) Villagomez's employment
agreement with Southern Clay (executed at time when parent company was Laporte,
Inc.). Villagomez also provided deposition testimony of Donna Abunzo, Michael
Piacentino, Thomas Riordan, Vernon Sumner, and Keith Stultz in support of its
contention that Rockwood's special appearance should be denied. 

 Rockwood's contentions were largely adopted by and reflected in the findings
of fact issued by the trial court. (4) The trial court also issued conclusions of law which 
reflect: (1) Rockwood has insufficient minimum contacts with Texas to support the
exercise of general jurisdiction, and the court has no personal jurisdiction over it; (2)
facts do not support that Rockwood has a "general presence" in Texas; (3) Villagomez
did not plead alter ego and, therefore, that theory cannot support jurisdiction; (4) even
if alter ego had been alleged, Villagomez has not sustained its burden to show that
Rockwood exercises control over the business operations and affairs of Southern Clay
to an extent greater than that normally associated with common ownership; (5)
Villagomez did not plead or prove any theory of "joint enterprise," and disavows any
reliance on that theory; (6) even if "joint enterprise" were available, facts do not
support its application; (5) (7) Villagomez's causes of action do not relate to or arise out
of any action or failure of Rockwood to act in Texas; (8) Rockwood has sustained its
burden to demonstrate that specific jurisdiction does not exist in this case; (9) with
respect to a negligent undertaking theory, Rockwood conducted no inspections of the
specific equipment involved in the incident, and Southern Clay neither relied upon
Rockwood for safety nor upon its guidelines with respect to Southern Clay's safety
programs; (10) Rockwood has not undertaken to ensure the safety of the employees
of Southern Clay, and jurisdiction may not be exercised on that theory; and (11)
Rockwood has insufficient minimum contacts with Texas to support the exercise of
personal jurisdiction. 

III. ISSUES ON APPEAL


 Villagomez raises seven issues on appeal: (1) did the trial court err in sustaining
the special appearance; (2) did Rockwood satisfy its burden to negate all possible
bases for personal jurisdiction; is the evidence (3) legally sufficient and (4) factually
sufficient to sustain the findings of fact and conclusions of law; (5) are Rockwood's
contacts with Texas sufficient to establish general jurisdiction or (6) specific
jurisdiction; and (7) did the trial court misplace the burden of proof for a special
appearance. 

IV. STANDARD OF REVIEW


 Whether a court has personal jurisdiction over a nonresident defendant is a
question of law. BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794
(Tex. 2002). However, the trial court frequently resolves questions of fact before
deciding the jurisdictional question. Id. If a trial court enters an order on a special
appearance and also issues findings of fact and conclusions of law, a party may
challenge the fact findings on legal and factual sufficiency grounds. Id. Unchallenged
fact findings are binding on the appellate court. Hotel Partners v. KPMG Peat Marwick,
847 S.W.2d 630, 632 (Tex. App.-Dallas 1993, writ denied). We conduct a de novo
review when applying the law to the facts. El Puerto de Liverpool, S.A. de C.V. v.
Servi Mundo Llantero S.A. de C.V., 82 S.W.3d 622, 622 (Tex. App.-Corpus Christi
2002, pet. dism'd w.o.j.) (op. on rehearing) (en banc). If an order on a special
appearance is based on undisputed or otherwise established facts, such as where the
nonresident defendant does not challenge the trial court's findings of fact, the exercise
of personal jurisdiction is a question of law we review de novo. Happy Indus. Corp.
v. Am. Specialties, Inc., 983 S.W.2d 844, 848 (Tex. App.-Corpus Christi 1998, pet.
dism'd w.o.j.). 

 A trial court's conclusions of law are not binding on this Court, and we are free
to make our own legal conclusions. Harlingen Irrigation Dist. Cameron County No. 1
v. Caprock Communications Corp., 49 S.W.3d 520, 530 (Tex. App.-Corpus Christi
2001, pet. denied); Muller v. Nelson Sherrod & Carter, 563 S.W.2d 697, 701 (Tex.
Civ. App.-Fort Worth 1978, no writ). When we conduct our de novo review of
conclusions of law, the judgment will be upheld if it can be sustained on any legal
theory supported by the evidence. Harlingen Irrigation Dist., 49 S.W.3d at 530 (citing
Circle C Child Dev. Ctr., Inc. v. Travis Cent. Appraisal Dist., 981 S.W.2d 483, 485
(Tex. App.-Austin 1998, no pet.)). A trial court's conclusions of law may not be
reviewed for factual sufficiency and may be reversed only if they are erroneous as a
matter of law. Stable Energy, L.P. v. Newberry, 999 S.W.2d 538, 547 (Tex.
App.-Austin 1999, pet. denied); Hofland v. Fireman's Fund Ins. Co., 907 S.W.2d 597,
599 (Tex. App.-Corpus Christi 1995, no writ). Incorrect conclusions of law do not
require reversal, provided that the controlling findings of fact support a correct legal
theory. Stable Energy, 999 S.W.2d at 547.

 A trial court's findings of fact are reviewable for legal and factual sufficiency of
the evidence by the same standards as applied in reviewing the legal and factual
sufficiency of the evidence supporting a jury's finding. Anderson v. Seven Points, 806
S.W.2d 791, 794 (Tex. 1991); see also Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex.
1996). When reviewing facts, the 

. . . final test for legal sufficiency must always be whether the evidence
at trial would enable reasonable and fair-minded people to reach the
verdict under review. Whether a reviewing court begins by considering
all the evidence or only the evidence supporting the verdict,
legal-sufficiency review in the proper light must credit favorable evidence
if reasonable jurors could, and disregard contrary evidence unless
reasonable jurors could not.

 

City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). We are to review the
evidence "in the light most favorable to the verdict, disregarding all contrary evidence
that a reasonable jury could have disbelieved." Ysleta Indep. Sch. Dist. v. Monarrez,
177 S.W.3d 915, 917 (Tex. 2005) (per curiam). If the evidence presented at trial
would permit reasonable and fair-minded people to differ in their conclusions, then
jurors must be allowed to do so. Keller, 168 S.W.3d at 822. The trier-of-fact,
whether the trial court or the jury, remains the sole judge of the credibility of the
witnesses and the weight to give their testimony. Id. at 819. It may choose to
believe one witness and disbelieve another, and a reviewing court cannot impose its
own opinions to the contrary. Id. If the evidence at trial would enable reasonable and
fair-minded people to differ in their conclusions, then jurors must be allowed to do so. 
Id. at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." Id. 
"[T]he court must consider evidence in the light most favorable to the verdict, and
indulge every reasonable inference that would support it. But if the evidence allows
of only one inference, neither jurors nor the reviewing court may disregard it." Id. 

 When reviewing factual insufficiency complaints, this Court considers, weighs
and examines all evidence which supports or undermines the finding. See Golden
Eagle Archery v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003). The finding is set aside
only if the evidence standing alone is too weak to support the finding or the finding is
so against the overwhelming weight of the evidence as to manifestly unjust and clearly
wrong. Id. V. PERSONAL JURISDICTION

A. Minimum Contacts with the Forum State

 Texas courts may assert personal jurisdiction over a nonresident defendant only
if such jurisdiction is authorized by the Texas long-arm statute, and is consistent with
federal and state standards of due process. See Tex. Civ. Prac. & Rem. Code Ann. §§
17.001-17.093 (Vernon 1997 and Vernon Supp. 2006); Am. Type Culture Collection,
Inc. v. Coleman, 83 S.W.3d 801, 806 (Tex. 2002); Guardian Royal Exch. Assurance,
Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991). The Texas
long-arm statute reaches "as far as the federal constitutional requirements of due
process will allow." Coleman, 83 S.W.3d at 806 (citing Guardian Royal, 815 S.W.2d
at 226). The statute lists particular acts that constitute "doing business," but also
provides that "other acts" of the nonresident may place him within the "doing
business" requirement. Schlobohm v. Schapiro, 784 S.W.2d 355, 357 (Tex. 1990). 

 Jurisdiction is proper if a nonresident defendant has established "minimum
contacts" with Texas and maintenance of the suit will not offend "traditional notions
of fair play and substantial justice." Int'l Shoe Co. v. Wash., 326 U.S. 310, 316
(1945). The purpose of minimum contacts analysis is to protect the defendant from
being haled into court when its relationship with Texas is too attenuated to support
jurisdiction. Coleman, 83 S.W.2d at 806; Schlobohm, 784 S.W.2d at 357. Focus is
therefore upon the defendant's activities and expectations. Coleman, 83 S.W.2d at
806. This analysis requires that the defendant "purposefully avail" itself of the
privilege of conducting activities in Texas, thus invoking the benefits and protections
of Texas laws, Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985), such that
the defendant could reasonably anticipate being called into a Texas court. World-Wide
Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); Coleman, 83 S.W.2d at
806. Jurisdiction will not attach if contacts are random, fortuitous, or attenuated. Id.,
Guardian Royal, 815 S.W.2d at 226. The quality and nature of the contacts, rather
than their number, are the focus of this analysis. Coleman, 83 S.W.3d at 806;
Guardian Royal, 815 S.W.2d at 230 n.11.

For half a century, the touchstone of jurisdictional due process has been
"purposeful availment." Since Hanson v. Denckla, "it is essential in each
case that there be some act by which the defendant purposefully avails
itself of the privilege of conducting activities within the forum State, thus
invoking the benefits and protections of its laws." Three aspects of this
requirement are relevant here. First, it is only the defendant's contacts
with the forum that count: purposeful availment "ensures that a
defendant will not be haled into a jurisdiction solely as a result of . . . the
'unilateral activity of another party or a third person.'" Second, the acts
relied on must be "purposeful" rather than fortuitous. Sellers who "reach
out beyond one state and create continuing relationships and obligations
with citizens of another state" are subject to the jurisdiction of the latter
in suits based on their activities. By contrast, a defendant will not be
haled into a jurisdiction solely based on contacts that are "random,
isolated, or fortuitous." Third, a defendant must seek some benefit,
advantage, or profit by "availing" itself of the jurisdiction. 


Michiana Easy Livin' Country, Inc. v. Holten, 168 S.W.3d 777, 784-85 (Tex. 2005)
(citations omitted).

B. Specific Jurisdiction

 A nonresident defendant's minimum contacts with Texas may confer either
general or specific jurisdiction. BMC, 83 S.W.3d at 795. In conducting specific
jurisdiction analysis, focus is on the relationship between Rockwood, the state of
Texas, and the litigation. Guardian Royal, 815 S.W.2d at 228. Activities of the
defendant in the forum may be isolated or disjointed, but where the cause of action
in issue arises from a particular activity, jurisdiction attaches and is said to be specific. 
Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414 n.8 (1984); BMC, 83
S.W.3d at 796 (citing Schlobohm, 784 S.W.2d at 357). Even a single act or event,
if it creates or gives rise to the plaintiff's cause of action, may constitute sufficient
minimum contacts to support the exercise of specific jurisdiction. Burger King, 471
U.S. at 476 n.18; Ahadi v. Ahadi, 61 S.W.3d 714, 719 (Tex App.-Corpus Christi
2001, pet. denied). This requirement for a "substantial connection" between the
plaintiff's cause of action and the defendant's contacts means that those contacts,
both with the litigation and the forum, must be meaningful, not "random, fortuitous,
or attenuated." Ahadi, 61 S.W.3d at 719. The substantial connection between the
nonresident defendant and the forum state necessary for a finding of minimum
contacts must come about by action or conduct of the nonresident defendant
purposefully directed toward the forum state. Guardian Royal, 815 S.W.2d at 226. 
An element of foreseeability is also implicit in the "substantial connection"
requirement; a nonresident defendant should be able to reasonably predict that it may
be subject to personal jurisdiction in the forum state. Ahadi, 61 S.W.3d at 719-20. 
However, "foreseeability" is not necessarily determinative when considering whether
the nonresident defendant purposefully established "minimum contacts" with the
forum state. Guardian Royal, 815 S.W.2d at 227. 

C. General Jurisdiction

 Where the defendant's activities in the forum are continuing and systematic,
jurisdiction may be proper without a relationship between the defendant's particular
act and the cause of action in issue. In these cases, jurisdiction is said to be general. 
BMC, 83 S.W.3d at 796; Guardian Royal, 815 S.W.2d at 228; Schlobohm, 784
S.W.2d at 357. "General jurisdiction requires a showing that the defendant conducted
substantial activities within the forum, a more demanding minimum contacts analysis
than for specific jurisdiction." BMC, 83 S.W.3d at 797 (citing CSR, Ltd. v. Link, 925
S.W.2d 591, 595 (Tex. 1996) (orig. proceeding); Guardian Royal, 815 S.W.2d at
228)). A nonresident must have conducted more substantial activity in the forum
state for the state to exercise general jurisdiction than for it to exercise specific
jurisdiction. CSR, 925 S.W.2d at 595. 

D. The Burden of Proof

 While a plaintiff bears the initial burden of pleading allegations sufficient to bring
a nonresident defendant within the provisions of the long-arm statute, Coleman, 83
S.W.3d at 807 (citing McKanna v. Edgar, 388 S.W.2d 927, 930 (Tex. 1965)), upon
the filing of a special appearance the nonresident defendant assumes the burden to
negate all bases of personal jurisdiction alleged by the plaintiff. Coleman, 83 S.W.3d
at 807; CSR, 925 S.W.2d at 596; Kawasaki Steel Corp. v. Middleton, 699 S.W.2d
199, 203 (Tex. 1985) (per curiam). In the absence of sufficient jurisdictional
allegations by the plaintiff, the defendant meets its burden of negating all potential
bases of jurisdiction by presenting evidence that it is a nonresident. M.G.M. Grand
Hotel, Inc. v. Castro, 8 S.W.3d 403, 408 n.2 (Tex. App.-Corpus Christi 1999, no
pet.); KPMG, 847 S.W.2d at 634. 

VI. ANALYSIS

 This is not an instance where jurisdiction may arise based upon the placement
of a particular product into the stream of commerce. Rather, Villagomez alleges that
both specific and general jurisdiction exist, based principally upon (1) the existence of
an employee of Rockwood living in Texas; (2) Rockwood's undertaking to provide
safety services to Southern Clay employees, including the provision of allegedly
mandatory safety policies, and the sending of Rockwood employees to Texas to
conduct business, conduct safety inspections and safety training; (3) the maintenance
of Rockwood property in Texas (i.e., the business records of Southern Clay); and (4)
Rockwood's entry into various contracts with other entities in Texas. 

A. The Burden of Proof Issues

 Villagomez alleges in its second issue that Rockwood failed to satisfy its burden
to negate all possible bases for personal jurisdiction. In its seventh issue, Villagomez
alleges that the trial court misplaced the burden of proof for a special appearance. 

 As previously noted, Rockwood bore the burden to negate all bases of personal
jurisdiction alleged by the plaintiff. Coleman, 83 S.W.3d at 807; CSR, 925 S.W.2d
at 596; Middleton, 699 S.W.2d at 203. Absent specific jurisdictional allegations, it
meets its burden of negating all potential bases of jurisdiction by presenting evidence
that it is a nonresident. M.G.M. Grand, 8 S.W.3d at 408 n.2; KPMG, 847 S.W.2d at
634. In its petition, Villagomez made the following specific allegations: 

Rockwood conducts business in Texas by maintaining an employee in
Texas and generally conducting business in Texas. In addition,
Rockwood voluntarily undertook to perform services in Texas that it
knew or should have known were necessary for the protection of
residents of Texas.


 The findings of fact and conclusions of law issued by the trial court reflect the
proper allocation of the burden of proof. They state that "Rockwood has sustained its
burden of demonstrating that it does not have sufficient minimum contacts with the
State of Texas to support the exercise of general jurisdiction over it." Villagomez
obviously disagrees with the trial court's evaluation of the facts and the conclusions
to be drawn from them, and essentially argues that the only way it could have
concluded as it did was to reverse the burden of proof. (6) 

 I would conclude from the evidence tendered by each of the parties that the
burden of proof was not improperly allocated and remained, at all times, upon
Rockwood as the party opposing jurisdiction. The record reflects that Rockwood did
tender evidence directed to rebutting the specific allegations of jurisdiction raised by
Villagomez, as well as evidence to negate all possible bases for jurisdiction. 

 Villagomez's remaining issues all deal with the sufficiency of the evidence to
support the trial court's finding as to special and general jurisdiction, such that the trial
court erred in sustaining the special appearance. I address the weight and merits of
that evidence below. 

B. Specific Jurisdiction

 As noted above, where the cause of action in issue arises from a particular
activity, jurisdiction attaches and is said to be specific. Helicopteros Nacionales, 466
U.S. at 414 n.8; BMC, 83 S.W.3d at 796; Schlobohm, 784 S.W.2d at 357. Even a
single act or event, if it creates or gives rise to the plaintiff's cause of action, may
therefore constitute a sufficient minimum contact. Burger King, 471 U.S. at 476 n.18;
Ahadi, 61 S.W.3d at 719. A "substantial connection" must exist between the
plaintiff's cause of action and the defendant's contacts, and the contacts must be
meaningful, not "random, fortuitous, or attenuated." Ahadi, 61 S.W.3d at 719. 

1. The Employment Status of Sumner

 Villagomez alleges that Southern Clay's president was actually an employee of
Rockwood and not Southern Clay. The employment agreement reflects Sumner was
indeed hired by Rockwood, but that he was "assigned to and employed by our
subsidiary, Southern Clay." He did report directly to Rockwood's president. Sumner
did participate in Rockwood's executive bonus plan. Villagomez alleged that by virtue
of Sumner's presence in Texas as an employee of Rockwood, Rockwood maintained
a place of business in Texas. It also cited to the need for Sumner to clear all
expenditure requests for Southern Clay in excess of $250,000 with its parent
company.

 Other evidence reflects that all Sumner's salaries and bonuses are paid by
Southern Clay, all his benefits, including all insurances, workers' compensation and
unemployment benefits, travel expenses, and company car, are paid for and provided
by Southern Clay, all taxes are withheld and paid by Southern Clay, his office, staff,
and equipment are supplied and paid for by Southern Clay, and he is responsible for
the business affairs of Southern Clay. 

 It is common for the parent of a wholly-owned subsidiary to exercise exclusive
authority over the hiring and firing of the subsidiary's officers. Zamarro v. Shinko Wire
Co., Ltd., 125 S.W.3d 132, 142 (Tex. App.-Houston [14th Dist.] 2003, pet. denied)
(holding that jurisdiction over the non-resident parent corporation did not attach and
that the parent's complete authority over general policy decisions of the subsidiary,
including hiring and firing of officers and approval of sizable capital investments, is
insufficient to show control over the internal business operations and affairs of the
subsidiary for jurisdictional purposes); see also Dunn v. A/S Em. Z. Svitzer, 885 F.
Supp. 980, 988 (S.D. Tex. 1995) (holding that a parent corporation is not subject to
the jurisdiction of a forum state merely because its subsidiary is present or doing
business there, unless the foreign parent exerts such domination and control over its
subsidiary that they are not in reality separate entities, and stating that "[t]he parent
may have complete authority over general policy decisions at the subsidiary, including
such matters as selection of product lines, hiring and firing of officers, and approval
of sizable capital investments, without being considered to exercise domination of the
company."). The trial court found no evidence or pleading to support any allegations
of alter ego or single business enterprise, and Villagomez does not rely on those
theories. 

 I would conclude that the evidence was legally and factually sufficient to
support the trial court's findings that Rockwood could not be subjected to Texas
jurisdiction based upon the status of Sumner's employment, Rockwood's approval of
large capital expenditures, or on the maintenance of a place of business in Texas by
virtue of Sumner's residence or business activities. 


2. The Voluntary Undertaking to Provide Services 

to Benefit Texas Employees


 Villagomez next alleges that Rockwood voluntarily undertook to perform services
in Texas that it knew or should have known were necessary for the protection of
residents of Texas, including the provision of allegedly mandatory safety policies, and
the sending of Rockwood employees to Texas to conduct business, safety inspections,
and safety training. (7) These activities are alleged to directly relate to safety and,
therefore, to the incident involving Villagomez, triggering specific jurisdiction.

 Villagomez tendered evidence that Rockwood provided the SHE Manual to
Southern Clay, argues that the policies therein were mandatory for its subsidiary, and
that Southern Clay complied with those policies. Villagomez tendered evidence alleged
to support its contentions as follows: (a) Rockwood personnel monitored Southern
Clay's compliance and safety performance; (b) Rockwood's risk manager, Piacentino,
as well as other employees, traveled to Texas to provide safety services on a
continuous basis; (c) Piacentino arranged for safety-related inspections, training,
surveys, and audits; (d) Piacentino corresponded regularly with Southern Clay
employees through e-mail about safety issues; (e) Piacentino traveled to Texas to
perform process hazards audits in 2001, 2002, and 2003; and (f) Piacentino's name
is included on a list with various Southern Clay personnel as a contact in the event of
an emergency at the facility. 

 Rockwood countered with evidence that in some instances directly controverts
the allegations of Villagomez. In other instances, Rockwood disagrees with the
interpretation or meaning of the same evidence tendered by Villagomez, and cites
evidence to support its interpretations. 

 Rockwood presented testimony to show that Rockwood's SHE Management
Program Guidance Manual is indeed provided for guidance purposes only, that
Southern Clay had been in business for many years before its acquisition by
Rockwood, and had developed, implemented, and continued to rely solely upon its
own safety policies and procedures. Additional testimony reflected that Southern Clay
policies and procedures already in place met or exceeded those provided in
Rockwood's guidance manual, and that Southern Clay personnel did not rely upon and
felt no need to modify existing policies to conform to any Rockwood suggestions. 

 It is undisputed that Piacentino traveled to Texas on occasion, but the purpose
of most of those visits is directly disputed. Although it is undisputed that Piacentino
communicated by e-mail with all subsidiaries about safety issues, the nature of that
interaction is in dispute. Rockwood agrees that Piacentino is Rockwood's risk manager
and responsible for securing package insurance for Rockwood and all its subsidiaries;
however, the subsidiaries, including Southern Clay, pay for their own coverage. He
is the key contact with the insurance companies. He also monitors the safety
performance of Rockwood's subsidiaries. However, Rockwood also tendered evidence
to show that it never undertook to direct or ensure safety for Southern Clay
employees. Evidence showed (1) Southern Clay was responsible for its own training;
(2) Southern Clay, rather than Rockwood or Piacentino, performed its own equipment
inspections to determine when new equipment might be required and to ensure the
safety of the equipment; (3) neither Rockwood nor Piacentino prepared, required, or
conducted any safety training at Southern Clay; (4) neither Rockwood nor Piacentino
ever directed or conducted any safety audits at Southern Clay; (5) Southern Clay
conducts its own self-audits; (6) Piacentino receives monthly reports on safety
statistics from Southern Clay, as he does from all Rockwood subsidiaries; (7) Southern
Clay and not Rockwood hired a third party to consult with respect to one audit, and
no such third-party evaluators were hired by Rockwood; (8) on one visit to Southern
Clay, Piacentino addressed in general terms only the protocol for conducting a safety
audit; (8) (9) Piacentino does not direct Southern Clay's safety operations; (10) Southern
Clay has its own safety management team; (11) Southern Clay's own personnel,
including Stultz (operations manager) and Holmes (SHE manager), are responsible for
identifying and implementing Southern Clay's safety policies and procedures; (12)
Southern Clay's safety program is not submitted to Rockwood for approval; (13)
MSHA investigated incidents at Southern Clay in 2001 and 2003, and all MSHA
citations were issued to Southern Clay and not to Rockwood. 

 Villagomez also alleges jurisdiction attaches because Piacentino led the accident
investigations following the 2001 and 2003 incidents at Southern Clay, and Piacentino
authored the accident investigation reports provided to MSHA in each instance. 
Rockwood counters that while Piacentino was admittedly a member of the
investigation teams for the 2001 and 2003 (Villagomez) incidents, he did not lead
either investigation. Evidence was tendered to show that he was a primary contact
with insurers and with MSHA. (9) Also, evidence confirms that Piacentino did author the
reports to MSHA, with input from all team members. 

 "Specific jurisdiction is established if the defendant's alleged liability arises from
or is related to an activity conducted within the forum." Commonwealth Gen. Corp.
v. York, 177 S.W.3d 923, 925 (Tex. 2005) (per curiam). Any contacts of Piacentino
with respect to an investigation of the 2001 incident are not related to the 2003
incident giving rise to Rockwood's potential liability. By the same token, Piacentino's
participation in the 2003 investigation took place subsequent to the incident, and are
therefore also not related to Rockwood's potential liability. The trial court could
property conclude these contacts were insufficient to give rise to specific jurisdiction.

 The trial court also considered the fact that MSHA citations were issued only
to Southern Clay and not to Rockwood, but that MSHA has authority to issue citations
to a parent where it has taken over the safety programs of the subsidiary. The trial
court could reasonably infer that MSHA did not conclude that Rockwood had taken
over safety responsibilities for Southern Clay. 

 With respect to the remaining potential bases for specific jurisdiction as set out
above, conflicting evidence existed and the parties applied conflicting interpretations. 
Rockwood contends that Piacentino's communications with Southern Clay regarding
safety were consistent with his communications with all Rockwood subsidiaries that
were engaged in varying sorts of businesses, and constituted only the normal, routine
interactions one would find between a parent and its subsidiary. (10) The trial court
agreed, issuing a finding to that effect, as well as other multiple findings consistent
with Rockwood's evidence and interpretations.

 I remain mindful that the trier-of-fact remains the sole judge of the credibility of
the witnesses and the weight to give their testimony. Keller, 168 S.W.3d at 819. It
may choose to believe one witness and disbelieve another, and a reviewing court
cannot impose its own opinions to the contrary. Id. If the evidence at trial would
enable reasonable and fair-minded people to differ in their conclusions, then jurors
must be allowed to do so. Id. at 822. I am further mindful that an appellate court is
not to assess liability or any issue on the merits, but rather the nature and extent of
any purposeful contact by Rockwood with Texas for jurisdictional purposes only. 
"[S]pecific jurisdiction is established if the defendant's alleged liability arises from or
is related to an activity conducted within the forum." CSR, 925 S.W.2d at 595. 
Specific jurisdiction requires a "substantial connection" between the plaintiff's cause
of action and the defendant's contacts, such that those contacts, both with the
litigation and the forum, are meaningful, not "random, fortuitous, or attenuated."
Ahadi, 61 S.W.3d at 719. 

 The trial court was required to weigh and balance the evidence before it. I
would conclude the evidence is legally and factually sufficient to sustain the trial
court's findings that the interactions of Rockwood with Southern Clay on safety issues
were not such that they would trigger specific jurisdiction. 

C. General Jurisdiction and "Continuous and Systematic" Contacts 

 Villagomez urges that the various communications between Rockwood (a)
through Sumner, in his capacity as head of Rockwood's additives business in the
United Kingdom, and (b) Piacentino with Southern Clay, even if not sufficient to
establish specific jurisdiction, did reflect a systematic and continuous interaction
sufficient to trigger general jurisdiction. Villagomez also urges that Rockwood
conducted other business in Texas in a "continuous and systematic" manner sufficient
to trigger general jurisdiction. 

 Villagomez urges general jurisdiction can attach based upon Sumner's work in
his role as a dual employee, performed in Austin, for the benefit of Rockwood's clay
additives business in the United Kingdom between 2001 and 2005. Villagomez
contends this amounts to maintaining a business office in Texas for the benefit of
Rockwood. Controverting evidence was tendered by Rockwood to show that the
United Kingdom business is not a subsidiary of Rockwood, which is a holding company
for only United States based subsidiaries. An entirely separate, albeit related,
company is the holding company for all overseas corporations. To further confuse
matters, Sumner would report to Rockwood's president in that instance as well, but
that individual apparently also served in a dual role and held office with respect to the
separate company owning the overseas interests. Therefore, I would conclude that
any information related to the business located in the United Kingdom, whether or not
Sumner actively participated in that business, is irrelevant to the assertion of
jurisdiction over Rockwood. 

 Villagomez also asserts general jurisdiction is proper based upon Rockwood's
records management policy, which reflects that all records are owned by the relevant
subsidiary and Rockwood. Similarly, Rockwood is a third party beneficiary of Ismael
Gomez's employment contract with Southern Clay with respect to intellectual
property. However, Rockwood's ownership of records or intellectual property is
derivative only, behind Southern Clay's ownership, and derives principally from
Rockwood's 100% ownership of Southern Clay. "Stock ownership and the related
right of control that stock ownership gives to stockholders [even a sole stockholder]
are insufficient to destroy the distinctness of corporate entities for jurisdictional
purposes." Commonwealth, 177 S.W.3d at 925. 

 Villagomez also points to travel of various other Rockwood employees to Texas
for business. These visits include the following: (1) Rockwood's president (two visits
in 2002 and one in 2003 for business review, and a visit to attend a "global sales
meeting" in Austin in 2002 (11)); (2) Rockwood's former president (four visits in 2001,
purposes for two unknown, the third visit to meet with Sumner, and the fourth to
attend a bond and rating agency meeting); (3) Rockwood's Controller (once in 2002
for business review); (4) Rockwood's Vice President for Law and Administration (three
times in 2002 for business review); (5) Rockwood's senior legal counsel (one visit in
2003 subsequent to Villagomez incident); and (6) Rockwood's CFO (three site visits,
two in 2001 and one in 2002, visits for business review once in 2002 and once in
2003). 

 The remaining travel of Rockwood personnel involved visits by Piacentino. He
made visits between 2001 and 2003 that included (1) May 2001 ( MSHA visit), (2)
May 2002 (site visit), (3) February 2003 (two separate visits related to the Villagomez
incident), and (4) April 2003 (two additional visits related to the Villagomez incident). 
Piacentino also communicated with Rockwood personnel relating to safety statistics,
and with respect to the 2001 and 2003 incidents and, as previously noted, he
participated as a member of Southern Clay's 2001 and 2003 investigation teams. 
Villagomez alleges that Piacentino's contacts alone are sufficient to trigger general
jurisdiction over Rockwood. 

 Rockwood urges that the trial court properly concluded that the various visits
and interactions were sporadic and conformed to normal, routine interactions between
a parent and subsidiary corporation, relying heavily upon Preussag Aktiengesellschaft
v. Coleman, 16 S.W.3d 110, 119-20 (Tex. App.-Houston [1st Dist.][ 2000, pet
dism'd w.o.j.). Preussag, a German holding corporation, had relations with its indirect
Texas subsidiaries which were its sole contacts with Texas. The bases alleged for
jurisdiction over Preussag were the subsidiaries' provision of financial reports, their
reference to Preussag's "Greenbook" delineating standard German accounting
procedures, the provision of lines of credit to subsidiaries and some "banking" services
to facilitate intercompany dividend payments, and loan repayments or payments for
services and products sold between group companies. Preussag also purchased
excess liability insurance to cover those subsidiaries in which it held at least fifty
percent interest. Additionally, some administrative assistance was provided. In each
instance, Preussag was a remote parent, holding interest in the specific company
through subsidiaries, sometimes in several layers. There were additional
communications between the subsidiaries and Preussag in sporadic letters. There
were two meetings between company representatives. The court determined that all
of the interactions were normal, corporate actions "such as occasional audits; unified
financial procedures for the annual reporting . . .; a unified 'banking' system, . . .
parent approval of large expenditures and budgets; consideration of adopting a group
benefits system; and the communications and visits that accompany these activities." 
Id. at 118-19. The court concluded that Preussag's "routine activities" within its
system did not make it amenable to suit in Texas because it failed to show any
"purposeful contact with Texas." Id. at 123. The contacts were of the type provided
to any member of its corporate family in any location. Id. In addition, the direct
communications between Preussag and its Texas subsidiaries were "fortuitous" only,
since the "banking system" in issue was not directed toward Texas, and the
subsidiaries were not its alter ego. Id. at 124. "Occasional travel to Texas is
insufficient by itself to establish continuous and systematic contact." Id. at 124
(citing Garner v. Furmanite Austl. Pty., 966 S.W.2d 798, 803 (Tex. App.-1st Dist.]
Houston 1998, pet. denied) (holding no general jurisdiction over individual who made
eight to ten visits over sixty days to Texas); see also Helicopteros Nacionales, 466
U.S. at 418 (finding no general jurisdiction despite defendant corporation's sending
management and personnel to Texas for consultation and training over seven-year
period)); Coleman, 83 S.W.3d at 808 (citing Dalton v. R&W Marine, Inc., 897
F.2d1359, 1362 n.3 (5th Cir. 1990) ("purchases and trips related thereto, even if they
occur regularly, are not, standing alone, a sufficient basis for the assertion of
jurisdiction.")). 

 I conclude the trial court could properly find that the travel of the various
corporate executives of Rockwood to visit Southern Clay was, for the most part,
normal and routine and therefore insufficient to trigger general jurisdiction. 
Piacentino's contacts were also carefully reviewed by the trial court. His contacts
were not systematic and continuous, but rather were sporadic. See BMC, 83 S.W.3d
at 797 (requiring that the defendant conduct substantial activities within the forum,
"a more demanding minimum contacts analysis than for specific jurisdiction."); see
also Helicopteros Nacionales, 466 U.S. at 418. The communications by e-mail related
to the gathering of safety statistics, and not to providing direction or control to
Southern Clay on how to conduct its safety management. Evidence supported that
the bulk of Piacentino's visits were routine and part of the normal interaction between
a parent and subsidiary. Further, they were comparable to and of the type provided
to any member of Rockwood's corporate family. See Preussag, 16 S.W.3d at 123. 
Evidence also reflected that his conduct in connection with and subsequent to the
2001 and 2003 (Villagomez) incidents, and his participation in the MSHA
investigations and reports, was that as a parent interested in significant events
occurring at its subsidiary, in which a parent would have a natural interest as sole
stockholder. Id. Evidence existed to support Rockwood's contention that Piacentino
neither directed not controlled the investigations, but simply participated and acted as
a liaison in communicating results of those investigations. I would conclude the
evidence is not too weak to support the trial court's findings as to general jurisdiction
with respect to Piacentino's interactions, and the findings are not so against the
overwhelming weight of the evidence as to be manifestly unjust and clearly wrong. 
Golden Eagle, 16 S.W.3d at 761. 

 To complete analysis, it is necessary to look to Rockwood's other business
contracts with three other Texas entities. First, there is an alleged December 2001
contract with Royal & Sun Alliance, of Addison, Texas. Villagomez alleges Rockwood
requested a boiler inspection be performed for Southern Clay in conjunction with
securing insurance. The documents in evidence include letters from Royal & Sun
Alliance to Southern Clay about the inspection, with a copy to Piacentino. They do not
include a copy of a contract. Nothing indicates that the agreement is with Rockwood. 

 Next in issue is an alleged 2002 contract between Rockwood and Hartford
Steam Boiler Inspection and Insurance Company, working out of its Houston office,
to perform an inspection at Southern Clay. The document in evidence reflects only
that internal inspections were conducted on three tube boilers located at Southern Clay
by Hartford on behalf of its insured, Rockwood. Letterhead identifies the Hartford
Steam Boiler Inspection and Insurance Co. at its Atlanta, Georgia address. Copies of
the report were issued to Piacentino, Hartford Steam Boiler, and "Southern Clay
Products, Subsidiary." 

 Finally, there is a contract between Rockwood and HealthFirst Administrative,
entered into January 1, 2003, and effective through 2005. Under this agreement,
HealthFirst serves as independent third party administrator for benefits for the entire
family of Rockwood companies. HealthFirst is admittedly a Texas corporation. The
contract with Rockwood states it "shall be interpreted and construed in accordance
with the law of the state of Texas except to the extent superseded by federal law." 
Donna Abrunzo testified that this agreement was negotiated by a third party
consultant and signed by Rockwood in New Jersey. 

 In some circumstances, a single contract may meet the purposeful-availment
standard, but not when it involves a single contact taking place outside the forum
state. See Michiana, 168 S.W.3d at 787. A long-term franchise agreement may
establish minimum contacts because, though it stems from a single contract, it
involves many contacts over a long period of time. Id. (citing CMCC v. Salinas, 929
S.W.2d 435, 438 (Tex.1996)). Similarly, a life-insurance policy may stem from a
single contract, but necessarily involves a series of contacts until death does the
parties part. Michiana, 168 S.W.3d at 787 (citing McGee v. Int'l Life Ins. Co., 355
U.S. 220, 223 (1957)). 

 Jurisdiction is premised on the notion of consent. Coleman, 83 S.W.3d at 808. 
"[B]y invoking the benefits and protections of a forum's laws, a nonresident defendant
consents to being sued there." Id. Rockwood urges there was no consent because
the contract with HealthFirst does not obligate Rockwood to perform any services in
Texas. Villagomez counters that executing a contract subject to Texas law constitutes
consent to be subject to Texas jurisdiction. However, case law provides otherwise. 

 I have reviewed Alenia Spacio, S.P.A. v. Reid, 130 S.W.3d 201 (Tex.
App.-Houston [14th Dist.] 2003, pet. denied), in which the court discussed a contract
between an Italian company and a Texas corporation which contained a Texas
choice-of-law provision. Reid had asserted that by agreeing to this Texas
choice-of-law provision, Alenia availed itself of the benefits and protections of Texas
law and consented to being sued in Texas. The Houston court disagreed, determining
that agreeing to a Texas choice-of-law provision, without more, did not mean a party
availed itself of any protection from Texas courts or voluntarily submitted to personal
jurisdiction in Texas courts, absent an express understanding to that effect. Id. at
219; see also 3-D Elec. Co. v. Barnett Constr. Co., 706 S.W.2d 135, 145 (Tex.
App-Dallas 1986, writ ref'd n.r.e.) ("although a 'choice of law' provision in a contract
is significant in determining whether jurisdiction should be had in the forum state, such
a provision cannot be construed as a voluntary submission by a defendant to the
personal jurisdiction of the courts of the state in the absence of any express
understanding to that effect.") (citations omitted). There was no evidence in the Reid
record of an express understanding that Alenia submitted to the jurisdiction of Texas
courts by executing the contract. Here, there is similarly no evidence of any express
understanding that Rockwood agreed to submit to personal jurisdiction in Texas. I
cannot conclude that Rockwood is subject to general jurisdiction of the Texas courts
based on this contract with HealthFirst, or on the other contracts in issue.

D. Traditional Notions of Fair Play and Substantial Justice

 A party opposing a nonresident defendant's special appearance must show that
the exercise of in personam jurisdiction comports with fair play and substantial justice. 
Schlobohm, 784 S.W.2d at 357-58 (citing Asahi, 380 U.S. at 113; Burger King, 471
U.S. at 476-77); Int'l Shoe, 326 U.S. at 316. However, because I find that neither
specific nor general jurisdiction attaches, I do not perform this analysis. 

VII. Conclusion

 In considering this special appearance, I have not reached the merits of the
allegations or determine whether a wrong has been committed in Texas. Rather, I
have looked solely to determine whether Rockwood initiated contacts with Texas by
which it purposefully availed itself of the privilege of conducting activities in Texas,
thereby invoking the benefits and protections of Texas laws such that it could
reasonably anticipate being called into a Texas court. 

 The evidence before the trial court supported its conclusions that neither
specific nor general jurisdiction attach to Rockwood. The trial court's conclusions of
law are not erroneous as a matter of law. Stable Energy, 999 S.W.2d at 547;
Hofland, 907 S.W.2d at 599. Accordingly, I would overrule Villagomez's issues on
appeal and affirm the trial court's order granting Rockwood's special appearance. 



 ERRLINDA CASTILLO

 Justice 


Dissenting Opinion delivered and filed this 

the 30th day of November, 2006.

1. At the hearing, the parties tendered their respective exhibits and deposition testimony, as well
as objections to affidavits. The parties presented argument, and all was taken under advisement by the
trial court. 
2. That same date, the trial court issued rulings on Villagomez's objections to deposition and
affidavit testimony tendered by Rockwood in support of its special appearance. The objections and the
rulings thereon specifically itemize the language in the question and the basis for the objection. Of the
twenty-one objections to deposition testimony, all but three are overruled. Of the twelve objections to
affidavit testimony, all but one are overruled. No issues are raised in this appeal relating to any of these
objections. 
3. This listing is not all-inclusive. Rockwood agreed not to object to the Villagomez's evidence
for the purposes of the hearing on jurisdiction only. 
4. Rockwood submitted 67 proposed findings of fact and 14 proposed conclusions of law to the
trial court; Villagomez submitted objections to those proposals and proposed alternative findings of fact
and conclusions of law. The trial court issued 65 findings of fact and 11 conclusions of law,
substantially similar to Rockwood's submissions. 
5. Villagomez did not plead alter ego, single business enterprise, or joint enterprise. Villagomez
consistently alleges only that Rockwood's direct acts in and contacts with Texas are sufficient to
subject it to jurisdiction in a Texas court. 
6. I note the conclusions of law which related to Villagomez's failure to sustain its burden of
"proving facts to support the theor[ies of alter ego and joint enterprise] as a basis for jurisdiction,"
whether or not appropriate at this stage, are unnecessary to any ultimate conclusion on Rockwood's
special appearance. The trial court first finds, in each instance, that Villagomez did not plead either
theory and, indeed, Villagomez in its brief disavows any reliance upon those theories. 
7. The Texas Supreme Court has recognized a theory of negligent undertaking as requiring the
submission of the following specific duty predicates: (1) the defendant undertook to perform services
that it knew or should have known were necessary for the plaintiffs' protection, (2) the defendant failed
to exercise reasonable care in performing those services, and either (3) a third party charged with
protecting the plaintiffs relied upon the defendant's performance, or (4) the defendant's performance
increased the plaintiffs' risk of harm. Torrington Co. v. Stutzman, 46 S.W.3d 829, 839 (Tex. 2000) 
(citing the Restatement (Second) of Torts § 323 (1965)); see Coastal Corp. v. Torres, 133 S.W.3d
776, 780 (Tex. App.-Corpus Christi 2004, pet. denied).
8. Deposition testimony was tendered to show that although written documents reflect that
Piacentino conducted a process hazards audit in 2002, that event actually consisted of Piacentino
providing instruction on hazards audit protocol. 
9. A letter was forwarded announcing that Piacentino would lead the investigative team inquiring
into Ismael Villagomez's death; handwritten notes of one team member also indicated Piacentino was
leader of the team. Deposition testimony of several individuals was tendered to directly controvert this
alleged leadership role. The internal investigation report lists nine members of the investigative team,
with Piacentino listed last. 
10. Rockwood cited Preussag Aktiengesellschaft v. Coleman, 16 S.W.3d 110, 119-20 (Tex.
App.-Houston [1st Dist.][ 2000, pet dism'd w.o.j.) to urge that its contacts with Southern Clay were
simply routine actions between a parent and its subsidiary, of the type that will not trigger personal
jurisdiction over the parent. Because Preussag applies general jurisdiction rather than specific
jurisdiction, I discuss this argument in depth when I address the question of general jurisdiction. 
11. Rockwood tendered testimony to show this "global sales meeting" in fact related solely to
Southern Clay's business and its sales representatives, and that Rockwood has no sales force.